GUNDRUM, J.
¶1 John Finley appeals from a judgment of conviction for repeated sexual assault of the same child-his nine-year-old niece-as well as from the denial of his postconviction motion. He insists he is entitled to a new trial because the circuit court erred in denying his motion to suppress a taped, incriminating statement he made to the police. He claims the statement was involuntary, specifically asserting he was coerced into making it, in violation of his state and federal due process rights. We conclude that Finley's statement was voluntary, and thus the court did not err. We affirm.
Background
¶2 Following a May 2014 report by Finley's niece that Finley had touched her breasts and vagina, under her clothes, on numerous occasions, police officers Saul Valadez and Adam Vander Steeg visited thirty-six-year-old Finley at his apartment, which he shared with his mother. According to Valadez' testimony at the suppression hearing, Finley and his mother appeared to be aware of allegations against Finley prior to the officers' arrival. The officers entered the apartment with the consent of Finley's mother, Vander Steeg in casual clothes and Valadez in his police uniform.
¶3 In the apartment, Valadez called out Finley's name and Finley responded from the bathroom. Shortly thereafter, Finley "crawled" out of the bathroom, stood up, and then walked over to and sat down at the kitchen table. Finley expressed that he was not feeling well, although he never vomited, indicated he was going to, or "pass[ed] out." Throughout the interview, the officers offered to get Finley medical assistance if he desired, but Finley declined, except at the end of the interview after he admitted to incriminating acts with his niece.
¶4 On this latter point, Vander Steeg testified that Finley only responded in the affirmative to their offers to secure medical assistance "after I think he realized what ... he had said." At that point, Vander Steeg believed Finley "was panicking about what he had said, but it also seemed very much like he was acting" as if he was having "chest pains, couldn't breathe." Valadez testified that after Finley admitted he had inappropriately "touched" his niece, Finley embraced his chest area and "was kind of shaking a little bit," which Valadez believed was related to anxiety. At that point, the officers called an ambulance for Finley, and he was "medically cleared" from the hospital after about "an hour or two." Both officers testified that they questioned whether Finley was actually sick at the time of the interview. Valadez testified that Finley's "health or his state of being at [the time of the interview] was adequate enough for me to speak with him without him receiving medical attention" and that Finley himself never said anything to contradict that perception.
¶5 The interview lasted just under an hour, with Finley, Valadez, and Vander Steeg sitting around the kitchen table while Finley's mother was elsewhere in the apartment. Finley was never handcuffed, moved against his will, or yelled at. Finley raised the issue as to whether he was under arrest and whether he needed a lawyer, and the officers told him he was not under arrest, informed him that his mother had allowed them into the apartment, and told him that he could tell them to leave at any time. Finley never asked the officers to leave or expressed that he wanted to end the interview. The officers made no promises to or threats against Finley and neither officer drew a weapon. Valadez twice got Finley a glass of water when he indicated he was thirsty.
¶6 Valadez testified that prior to the interview, he was aware Finley had "at least one prior ... sexual assault conviction." He agreed that "[o]rdinarily someone who ends up convicted of a sexual assault would have had police contact" and that Finley appeared to have "some familiarity with being accused of a crime" and "[i]nteracting with police." He testified that the niece's mother, who is Finley's sister, told him Finley had the mental capacity of a twelve year old. Valadez explained he had some experience interviewing mentally disabled persons but agreed he was "not an expert on levels of cognitive functioning." He testified that Finley's answers to his questions were responsive and he saw no indication Finley was hallucinating or losing consciousness, and he confirmed that he believed Finley had "adequate communication skills ... to discuss the allegations against him." Both officers testified they believed Finley understood their questions.
¶7 Vander Steeg testified that he has an awareness from his training and experience, including "thousands of interviews" he has done, as to whether someone is cognitively disabled, and he did not notice any cognitive limitations with Finley during the interview. He further testified that Finley progressively confessed, first to "roughhousing" with his niece on occasions and eventually to placing his finger in her vagina. Vander Steeg asked Finley if he put a finger into his niece's vagina. He asked this in order to "sort of explor[e] the extent of what had happened to [the niece]" because in his experience, child victims of sexual assault "oftentimes do not fully disclose a lot of stuff, out of feeling guilt, shame, being threatened they're going to be taken away, threatened that the person that sexually assaulted was going to be going away to prison ... if they disclose and put that blame and shame onto them." Vander Steeg testified that Finley expressed that "he had inserted his finger into her vagina for five to ten seconds for the purpose of showing [her that] if any boy ever did something like that to her that she needs to tell him." Vander Steeg stated that Finley never "backtrack[ed]" on any of the statements he made.
¶8 Finley's aunt, Linda Reed, testified on Finley's behalf. She stated she is a retired county social worker and had worked in the mental health field for over thirty years, and specifically had experience working with individuals with "cognitive limitations." She testified that Finley "has an intellectual functioning ability between 11 and 12-years old," "needs more than one direction or one instruction to follow a task generally," has a weak short-term memory, "[p]oor attention span," "lack of judgment at times," was unable to "hold a job, like at McDonald's, because he's too slow," is easily manipulated and intimidated, is "passive," has "been bullied all his life," "[g]ives in-in pressure situations," has an "inability to ... understand ... certain in-depth questions," and "just says what people ... want to hear." She added that he graduated from Lakeland Special Education School, acts in a manner consistent with individuals who are "borderline intellectual functioning," and is "vulnerable to suggestion." On cross-examination, Reed acknowledged she was not a psychologist. She admitted that Finley had contact with police "throughout his life," had gone to court in the past for criminal cases, including two cases involving "sexual contact with minors," and had himself also been "the victim of some crimes."
¶9 Doctor Roland Manos testified that he performed a psychological evaluation on Finley on December 1, 2014, which evaluation showed Finley to "be functioning within the borderline range of intellectual ability." He stated that Finley has an IQ of seventy-two, "below 70 begins the range of intellectual disability which has formerly been referred to as mild mental retardation," and that ninety-seven percent of the population has a higher IQ than Finley. Manos observed Finley to have "problems with verbal comprehension, working memory, and processing speed"; however, Finley was "able to complete the interview" with Manos and "respond[ed] accordingly" to Manos' questions, which were "presented simply and concretely."
¶10 On cross-examination, Manos stated that Finley was able to provide information about his recent history and relate his own personal experiences and that his responses to Manos' questions were "relevant," "coherent," and "rationally related to" the questions. Manos did not observe any shortcomings in Finley's "reality content," and he acknowledged that Finley's limitations "are not disabling," adding that federal guidelines identify a "disabling intellectual ability" as an IQ of fifty-nine or lower. Manos testified that "for the most part, Mr. Finley would be able to answer accurately questions that were simple, short, and concrete." He agreed that Finley's experience with the criminal justice system due to his prior convictions for sexual assault would be "somewhat useful" to him providing law enforcement with accurate responses.
¶11 The circuit court found the interview lasted less than an hour, took place in Finley's home at his kitchen table, at which Finley voluntarily sat down, and his mother was present in the apartment although in a different room. Finley was not handcuffed or "restrained in any way," was never moved to a different location, was not frisked, was "told he was not under arrest and that he could tell the officers to leave," and no gun was drawn on him. While there were two officers involved in the questioning, the tone was conversational and Valadez provided Finley water during the questioning. The court expressed that while there is "some degree of psychological coercion" inherent in any interrogation, in this case there was "none to the extent that it was an improper police tactic." The court could not determine whether Finley was "faking" illness or if he "was actually ill" at the time of the interview with Valadez and Vander Steeg. Considering Manos' testimony, the court found that Finley is "on the lower end of intellectual functioning." The court also found that Finley did have some prior police "contacts," but the record did not show that he had been previously interrogated by police. The court denied Finley's suppression motion, concluding that Finley's statement to the officers was voluntarily made. Finley appeals.
Discussion
Standard of Review
¶12 Whether Finley's statement was voluntary "is a question of constitutional fact." See State v. Moore , 2015 WI 54, ¶52, 363 Wis. 2d 376, 864 N.W.2d 827. With constitutional facts, we accept the circuit court's findings of "fact unless they are clearly erroneous," but we independently apply constitutional principles to those facts. Id. (citing State v. Jennings , 2002 WI 44, ¶20, 252 Wis. 2d 228, 647 N.W.2d 142 ).
Voluntariness of Finley's Statement
¶13 A defendant's confession must be voluntary or the use of it in a prosecution violates his/her due process rights. Moore , 363 Wis. 2d 376, ¶55. A confession is voluntary "if it is 'the product of a free and unconstrained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation in which the pressures brought to bear on the defendant by representatives of the State exceeded the defendant's ability to resist.' " Id. (citation omitted). "[I]n order to justify a finding of involuntariness, there must be some affirmative evidence of improper police practices deliberately used to procure a confession. In other words, a suspect's personal characteristics alone cannot form the basis for finding that the suspect's confessions, admissions, or statements are involuntary." Id. , ¶56 (citation omitted). "Voluntariness is evaluated in light of all the circumstances surrounding interrogation and decided under a totality of the circumstances, weighing the suspect's personal characteristics against the actions of the police." Id. (footnote omitted). "The government bears the burden of establishing-by a preponderance of the evidence-that a confession was voluntary." Id. , ¶55.
¶14 The defendant's personal characteristics to be considered include his/her "age, education and intelligence, physical and emotional condition, and prior experience with law enforcement." Id. , ¶56 n.17 (citation omitted). As for police conduct, we consider, "among other things, the length of questioning, general conditions or circumstances in which the statement was taken, whether any excessive physical or psychological pressure was used, and whether any inducements, threats, methods, or strategies were utilized in order to elicit a statement from the defendant." Id. , ¶57 (citation omitted).
¶15 We first consider Finley's personal characteristics. See id. , ¶58. At the time Finley was questioned, he was thirty-six years old. He had graduated from Lakeland Special Education School. While the record shows he has low intellectual functioning capability, he does not fall into the range of "intellectual[ly] disab[led]." Despite his intellectual limitations,[1] Finley was able to complete the evaluation with Manos, relating his own personal experiences and providing information about his recent history as well as responses that were "relevant," "coherent," and "rationally related" to Manos' questions. Manos observed no shortcomings in Finley's "reality content" and concluded Finley's intellectual limitations are "not disabling." Manos' unchallenged testimony was that "for the most part, Mr. Finley would be able to answer accurately questions that were simple, short, and concrete." Both officers testified that they believed Finley understood their questions.
¶16 As to his physical condition at the time of the interview, Finley insists he was sick, however, the circuit court did not so find. The officers appeared to believe he may have been faking illness, and the court indicated it could not conclude whether or not he was sick. Valadez testified he saw no indication Finley was hallucinating or losing consciousness, which is consistent with our own review of the videotape of the interview in the record. Regarding Finley's emotional condition, Vander Steeg testified that he did not believe Finley "ever got emotional"; however, the officers observed him become anxious after confessing to inappropriately touching his niece, with Vander Steeg stating that Finley at that point appeared to "realize[ ] what ... he had said."
¶17 Evidence was also presented that Finley was no stranger to the court system in that Valadez testified that Finley had "at least one prior sexual assault conviction" and appeared to have "some familiarity with being accused of a crime" and "[i]nteracting with police." Finley's aunt confirmed Finley had contact with police "throughout his life" and had gone to court in the past for criminal cases, including two cases involving "sexual contact with minors." Manos agreed that Finley's prior experience with the criminal justice system due to his prior convictions for sexual assault would be "somewhat useful" to Finley providing law enforcement with accurate responses. We also observe that Finley had sufficient awareness, understanding, and knowledge of the criminal justice system to ask the officers during the interview if he needed an attorney and to raise the issue as to whether he was under arrest.
¶18 With regard to the officers' conduct, again, we consider, among other things, "the length of questioning, general conditions or circumstances in which the statement was taken, whether any excessive physical or psychological pressure was used, and whether any inducements, threats, methods, or strategies were utilized in order to elicit a statement from the defendant." Id. , ¶57. Here, the tactics utilized by Vander Steeg and Valadez do not indicate Finley's confession was involuntary.
¶19 Finley was interviewed by the officers for less than an hour while sitting around his kitchen table in the security of his own home with his mother present in the apartment the entire time-not isolated for hours at a police station or in the back of a squad car.[2] Valadez brought Finley water when Finley expressed he was thirsty, and the officers asked him if he wanted medical attention, which Finley declined until after he appeared to become anxious following his incriminating statements.
¶20 Although Valadez wore his police uniform, Vander Steeg was in "casual clothing." While the officers never read Finley the Miranda[3] warnings, they informed him he was not under arrest and could tell them to leave at any time. Finley was not handcuffed, frisked, moved against his will, or yelled at. The officers made no promises to or threats against him and never drew a weapon. Finley never asked the officers to leave or expressed he wanted to end the interview. The court found the tone of the interview was "conversational," and this finding is not challenged on appeal and is consistent with our own review of the videotaped interview.
¶21 Finley insists his incriminating statement was involuntary because of various interrogation techniques utilized by the officers during their questioning of him. He complains of the officers "express[ing] certainty" that he had sexually touched his niece and of the officers using a tactic of "minimization," "consist[ing] of trying to make sexual touching appear relatively normal, either by a suggestion that it was roughhousing or that it was accidental." He further complains that the officers introduced "the lie that [the niece] said that Mr. Finley's finger penetrated her vagina"[4] and that the officers then "built on the lie" and accentuated their "trickery" by "suggesting that any denial by Mr. Finley was tantamount to disrespect for his niece" whom he "loved."[5]
¶22 These tactics are common in law enforcement interviews of criminal suspects. Were we to follow Finley's apparent suggestion that law enforcement should be limited to simply accepting a criminal suspect's first-response denial to a one-time asked, open-ended question of "Did you sexually assault your niece?" law enforcement may as well simply be precluded from questioning suspects altogether. There is nothing untoward with the officers' tactics here, and despite Finley's complaints, he cites no controlling law that the tactics were improper. See Moore , 363 Wis. 2d 376, ¶64 (noting that although "tactics such as minimizing, suggesting that [the victim's] death may have been an accident, and telling [the defendant] that other witnesses were saying he shot [the victim]" may have influenced the defendant, "they are tactics that courts commonly accept").
¶23 The circuit court concluded that Finley's confession was voluntary. Having watched the video ourselves, we observe that Finley appeared to have full awareness and understanding of the questions being asked by the officers and, while his responses are at times difficult to hear, when we are able to hear the responses, they appear to us to be responsive to the question being asked. The officers were not overbearing upon Finley and they gave him every opportunity, and even invited him, to tell them if he wanted to end the interview and have them leave the apartment. He did not do so. The interview was conversational, it did not last for an excessive length of time, it took place in the security of his own apartment with his mother present in the apartment at all times, and the officers even made sure to get him water when he indicated he was thirsty. While Finley's intellectual capacity certainly is a significant consideration, it is not dispositive. Considering the totality of the circumstances, we agree with the circuit court that his statement was voluntary "because the pressures placed on him by interrogation did not 'excee[d his] ability to resist.' " See id. , ¶65 (noting that during the eleven hours Moore was in custody, the officers informed him of his rights, "fed him, gave him water, took breaks, and treated him with decency and respect. Moore's age and intellectual capacity, while significant, are not dispositive. Thus, although the detectives persuaded Moore to confess that he shot [the victim], Moore's decision to do so was a voluntary decision").
By the Court. -Judgment and order affirmed.
Not recommended for publication in the official reports.

A clinical and forensic psychologist, Dr. David Thompson, testified at trial that testing he performed on Finley indicated Finley has a "variety of cognitive and personality characteristics that make him far more compliant and far more suggestible than the normal individual of his age."

See State v. Moore , 2015 WI 54, ¶¶12-13, 25-40, 62, 363 Wis. 2d 376, 864 N.W.2d 827, where our supreme court did not even find the fifteen-year-old defendant's incriminating statements to police to be involuntary despite five and one-half hours of interrogation of him during the eleven hours he was in police custody-a significant amount of which was in the police station or the back of a squad car-without his parents or legal counsel.

Miranda v. Arizona , 384 U.S. 436 (1966).

Finley states that while his niece did repeatedly claim that he rubbed her vagina under her clothes, she never stated that he had penetrated her vagina.

Finley also complains that the officers utilized "complex questions." He cites no case in which a court found a confession involuntary because of the use of so-called "complex" questions. Moreover, we do not see in the questions of which he complains the level of complexity he propounds.
Finley complains of the following interview discussion/questions by Valadez:
Q What about recently, have you watched her recently? I guess you don't babysit cause she's not a baby but recently have you watched her while your sister has been either working or gone somewhere else or doing something[?]
....
Q .... Um, there was also some you know tickling and wrestling once in a while between you two, right, which is normal, that's normally between an uncle and a niece that's that's [sic] stuff that happened ever[y] once in a while, am I correct? Just some, you know some tickling and some wrestling and some....
....
Q Well you tell me, I mean you tell me. I mean there's I've, my opinion that's perfectly fine. Alright. You know I'm just ah, I just want to clarify it. I mean throughout those times while you guys were playing I mean, you know few times, inadvertently you know your hand accidentally touched her vagina, right. I mean that that happened a couple times, am I right John. Once again it's an accident man and we just want to, we just want to clarify these things.
As to the first question, we see nothing "complex" or confusing about this inquiry. The second question asks Finley if he occasionally engaged in "tickling and wrestling" with his niece and also does not seem particularly complex or tricky. With the third, most of it is conversation/comments by Valadez, not questioning. The question here is actually: "[T]hroughout those times while you guys were playing I mean, you know few times, inadvertently you know your hand accident[ally] touched her vagina, right. I mean that that happened a couple times, am I right John[?]" This question too-whether Finley's hand touched the victim's vagina during their tickling and wrestling-is not particularly complex, although in his briefing Finley attempts to make it appear more so by adding in Valadez' "minimizing" comments, referring to "playing" and "accident," before and after the question.
Finley also complains that the following "complex" question elicited an answer that was "not really responsive." Valadez asked:
So John ah, tell me about um, tell me about you accidentally touching her ah, on her private, I know, I mean you, you and I both know that that it happened and I know it was a complete accident, that stuff like that happens man, alright so tell tell [sic] me about a time recently when that when that happened.
Finley responded: "She wanted me to pick her up and there was no way that [I] could get a hold of her you know so I put one arm up like this, you know and then I...." Finley's answer appears to us to be responsive to Valadez' inquiry and our review of this portion of the video of the interview only reinforces this conclusion as Finley contemporaneously demonstrated for the officers how he attempted to pick up his niece. Finley was explaining to the officers "a time recently" when he "accidentally touch[ed]" his niece on "her private" area, which was precisely what Valadez was asking him about.
Even if the officers' questions were considered to be "complex," we view the quality of the questions, and the answers Finley provided, to be matters for challenge at trial. We do not see the questions as undermining the voluntariness of Finley's confession.